UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANDREA HAEGELE,                    )
                                   )
        Plaintiff,                 )
                                   )
    vs.                            )    Case No. 4:10CV80 CDP
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Andrea Haegele's application for benefits under the Social Security Act. This is a

proceeding under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq.,

for a period of disability and redetermination of Supplemental Security Income

(SSI) benefits. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides

that "the final determination of the Commissioner . . . shall be subject to judicial

review as provided in section 205(g) [42 U.S.C. § 405(g)] to the same extent as the

Commissioner's final determination under section 205." Haegele alleges that she

is disabled due to bipolar disorder, narcolepsy, and back pain. Because I find that

the decision denying benefits was not supported by substantial evidence, I will

reverse the decision of the Commissioner.

## Procedural History

Haegele received SSI benefits as a child.  When Haegele turned eighteen her eligibility for these benefits was redetermined under the rules for determining disability in adults.  On December 31, 2007, the Social Security Administration determined that Haegele was no longer disabled.  This determination was upheld on reconsideration.  Haegele filed a timely request for hearing, and a hearing was held before an Administrative Law Judge (ALJ) on June 9, 2009.   Haegele was represented by counsel.  She and her mother appeared for the hearing and testified.  On June 18, 2009, the ALJ issued a decision that Haegele was not disabled.  On December 7, 2009, after reconsideration of newly submitted evidence, the Appeals Council of the Social Security Administration denied Haegele's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

Haegele completed a Function Report-Adult in connection with her benefits application on October 19, 2007.  Her mother Wynona Bryant completed the form for her.  On a typical day, Haegele has trouble getting up, she gets out of bed, gets dressed, goes to school in the morning, and then catches the bus to her

grandmother's house to meet her mother.  After she comes home, Haegele takes a long nap and cleans the house if she has energy.  She helps care for her pets, but her boyfriend does most of the cooking.  She does household chores "a little each day," but she needs to be encouraged to do so.  She did not drive.  She has a savings account that her mother handles.  She pays some bills, but needs help.  She shops, usually with her boyfriend.  Her mother handles her money.  She listed her hobbies as watching television, playing games, and walking "sometimes."  She sometimes blows up at others and needs to be alone and explodes more if she is around people frequently.  She stated that back problems made it difficult for her to lift, squat, bend, stand, walk, sit, and kneel, and that she also has problems with her memory, concentration, understanding, following instructions, and getting along with others.  She has to read instructions several times to understand them, and can follow spoken instructions, as long as they are not too long.  Haegele gets along with authority figures "ok," but cannot handle stress or changes in her routine.  She has never had a job.

Also on October 19, 2007, Bryant completed a Third Party Function Report in connection with Haegele's application for benefits.  Bryant also stated that Haegele struggles to get out of bed in the morning and has trouble paying bills and getting along with others.  Bryant completed a second Third Party Function Report

on January 21, 2008. Bryant claimed that Haegele lacked willpower to get up and get things done, and that she gets nervous and explodes when around people. She said that Haegele has trouble remembering things and paying attention. Bryant does not think that Haegele follows directions well, and thinks that she is always paranoid and "talks strangely sometimes."

In the Disability Report-Appeal completed by Haegele on September 3, 2008, Haegele reported that her condition had changed because she felt there were spirits around her putting thoughts in her head telling her to turn the wheel while driving and wreck, and her anger had worsened. She claimed that she: was scared that something was following her; paranoid; suspected that her boyfriend was cheating on her when he was not; and felt that people were watching her. Haegele reported that she felt like exploding and hurting someone at times. Haegele reported her medications as Abilify and Dexadrine for narcolepsy. She stated it takes her longer to understand things and sometimes does not understand them at all.

School Records

Haegele's school records were submitted to the ALJ, including the report that Haegele had failed the GED exam on January 23, 2008. Haegele was evaluated for a disability determination by the Steelville R-3 School District in

Steelville, Missouri on November 28, 2001. She had to be tested again because her test results from 2000 were "questionable" since she kept falling asleep. In the background information, Haegele's case manager Kim Burnett noted that Haegele had been diagnosed as having narcolepsy by Dr. Mason and was on medication for narcolepsy but not for depression. Burnett stated that since Haegele had been on the medication, her "behavior at school has drastically changed. She appears happy and alert. She is interested in her work and strives do well." Burnett also noted that Haegele had a sleep study conducted by Dr. Uong, and that "a clinical reported indicated that there was no evidence of significant sleep disorder breathing." She also claimed that Haegele had been evaluated by Dr. Elbert Bolsen, who indicated that she had probably been "over diagnosed and over medicated in the past." According to Burnett, Dr. Olsen diagnosed Haegele with "an adjustment disorder with mixed disturbance of emotions and conduct." However, neither the sleep study nor Dr. Olsen's report appears in the file.

After performing a battery of tests, the school district determined that Haegele was not disabled for the following reasons:

> Basis for determination was a WISC-III Full Scale IQ of 83, yielding a criterion score of 61. Woodcock-Johnson III Broad Reading 81, Broad Math 91, and Broad Written Language 90. All of Andrea's subtest scores were above the criterion level of 61. Reports from teachers indicated that Andrea has an interest in her school work, is

organized, completing assignments and is improving all grades. The Behavior Evaluation Scale scores of 115 and 100 indicated average or above levels of behavior.

Language Testing indicated normal levels of language functioning. Andrea has a weakness in one word repetitive and expressive vocabulary, however, when given in context of reading and conversation, comprehension of the words are increased.

A review of outside medical information indicated that Andrea does not have a sleep disorder. The district has still not received test results for narcolepsy. A neuro-psychological evaluation by Dr. Bolsen diagnosed Andrea as having an adjustment disorder with mixed disturbance of emotions and conduct. This does not seem to be a factor for Andrea at school. Teachers report that she is organized, interested in her classes, relates well with peers and her grades are significantly improving.

On October 19, 2007, Delight Everett, Haegele's Missouri Options Instructor, completed a Teacher Questionnaire in connection with her benefits application. Everett is a teacher at Steelville R-3 High School and claims to have known Haegele for more than ten years. Everett also stated that Haegele's actual grade level at that time was ten and that Haegele did not have an unusual degree of absenteeism. On the form, Everett checked that Haegele had "no observed problems" in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself. Everett did not know whether Haegele was on medication and made no written comments on the questionnaire.

<u>Medical Records</u>

Thomas Spencer, a licensed psychologist, performed a psychological evaluation of Haegele at the request of the SSA on November 21, 2007. Spencer opined that Haegele endorsed symptoms fairly consistent with bipolar disorder, although he also felt that intermittent explosive disorder could not be completely ruled out. She told him that she had not seen a psychiatrist in a couple of years because she "never really thought [she] needed to." She denied alcohol and drug abuse, but admitted experimenting with alcohol and marijuana in the past. Haegele presented as rather flat and lethargic and described her mood as "mellow." She was alert and oriented to person, place, time, and event, and was not observed responding to internal stimuli, nor was she overly paranoid, hypervigilant, or suspicious. She identified none of three proverbs, two of three similarities, and she demonstrated a questionable working knowledge of social norms. She could not recall three objects after five minutes without distraction and had trouble completing serial threes. Spencer concluded that Haegele appeared capable of understanding and remembering simple to moderately complex instructions and engaging in and persisting with simple to moderately complex tasks. However, Spencer opined that Haegele demonstrated significant limitations in her ability to interact socially and adapt to the environment, and that

she was only marginally capable of managing her benefits without assistance.  He

assigned her a GAF[1] score of 45-50.

Glen Frisch, M.D., examined Haegele and completed the Psychiatric

Review Technique in connection with her benefits application on December 6,

2007.  He concluded that Haegele suffered from ADHD and bipolar disorder with

moderate difficulties in maintaining social function and concentration, persistence,

and pace.  He found that she was alert, oriented, and cooperative.  He then wrote:

"She appeared lethargic, possibly due to narcolepsy."  Originally, he had typed

"her allegation of narcolepsy," but then he scratched out "her allegation of."

Frisch rated Haegele as moderately limited in the following areas: understanding

and remembering detailed instructions; carrying out detailed instructions;

maintaining attention and concentration for extended periods; sustaining an

ordinary routine without special supervision; working in coordination with or

proximity to others without being distracted by them; completing a normal

workday and workweek without interruptions from psychologically based

symptoms and performing at a consistent pace without an unreasonable number of

---

[1]A GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. revision 2000)(DSM-IV-TR).  A GAF of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning.

rest periods; interacting appropriately with the general public; accepting

instructions and responding appropriately to criticism from supervisors; getting

along with coworkers or peers without distracting them or exhibiting behavioral

extremes; maintaining socially appropriate behavior and adhering to basic

standards of neatness and cleanliness; responding appropriately to changes in the

work setting; and setting realistic goals or making plans independently of others.

Frisch believed that Haegele could interact and relate with others based on her

school records.  He noted that she had the ability to understand, remember, and

carry out simple and moderately complex instructions, despite her lack of mental

health treatment or medication for several years.  Frisch opined that Haegele could

maintain the concentration, persistence, and pace needed for unskilled and semi-

skilled jobs, and that she could interact appropriately in work settings "which do

not require large numbers of employees or frequent contact with the general

public."  He found that Haegele "has moderate restrictions in her ability to

perform work activity based on interruptions from psychologically based

symptoms," but that "further improvement would be expected with appropriate

mental health treatment."  Dr. Frisch concluded as follows:

> Dr. Spencer, the consultative examiner, has opined that the individual
> can understand and remember simple to moderately complex
> instructions and she can persist with simple to moderately complex

tasks. She has significant social limitations. Dr. Spencer's opinions are consistent with the evidence in the file and are reflected on the residual functional capacity assessment.

On December 17, 2007, William Busby, M.D., completed a physical residual functional capacity assessment for Haegele in connection with her application for benefits. Dr. Busby concluded that Haegele could only occasionally lift 50 pounds, could frequently lift 25 pounds, and could stand/walk/ and or sit for about six hours in an eight hour workday. He reasoned as follows:

> The individual alleges physical impairment of narcolepsy. The evidence shows that she carries the diagnosis and prescribed Dexadrine. The evidence does not show that the events are frequent or severe enough to affect ADLs. The school reported no problems in concentration, persistence and pace and no problems with general health and well being. She should avoid lifting the aforementioned heavy weights due to the possibility of injury.

When asked to describe the severity of Haegele's symptoms and their effect on function, Dr. Busby opined that "[t]he evidence shows that the individual does carry a diagnosis of narcolepsy and that she has associated treatment. However, the evidence does not show that the impairment severely limits her daily functioning or her school functioning."

On February 26, 2008, R. Stoecker, M.D., completed the following case analysis in connection with Haegele's disability determination:

> There is no documentation of a physical MDI in the file that would

chronically limit functioning. The treating family physician, Dr. Mary Mason, who has treated her at least from 1998 until the present, does not mention narcolepsy as a diagnosis until January 2006. ROC with Dr. Mason's nurse/through her from Dr. Mason finds that they have no record of a sleep study, believed that his Pathways doctor did this testing. But also, that Dr. Mason made this diagnosis . . . "she documented it by hypersomnolence, that a teacher said Ms. Haegele (3rd grade) was always falling asleep in school." ROC finds that Ms. Haegele has never had any sleep study testing. This is an unconfirmed diagnosis that is not reflected in ADLs. Ms. Haegele has a rare complaint of lumbar strain that is not limiting. There is no limitation to physical functioning.

Paul Stuve, Ph.D., a consultative examiner who reviewed Haegele's records, completed the Psychiatric Review Technique form for the SSA on January 29, 2008. Dr. Stuve found reported evidence of ADHD, inattention, and bipolar disorder. Dr. Stuve concluded that Haegele could understand and remember simple directions, maintain concentration and persistence for simple tasks and that since she functioned adequately in a classroom setting she would function adequately in a simple work setting. He felt that she would have moderate difficulty relating to the general public and to coworkers, but interact adequately with supervisors. She would have moderate difficulty adapting to changes in the workplace.

Haegele was initially seen at Pathways on February 6, 2008. She stated that she wanted help controlling her current symptoms, especially anger and mood

swings. Haegele's initial intake sheet also notes that "she also requires assistance with maintaining her disability benefits, if appropriate, due to her belief she is unable to work under normal conditions related to her mental health issues." Haegele was assessed with severe mania and impulse control accompanied by moderate anxiety, depression, and inattention/hyperactivity/impulsivity. Haegele's hallucinations and phobia were rated as mild. Haegele presented with an unkempt and disheveled appearance, psychomotor retardation, and a withdrawn manner. Her speech was soft, her mood was dysphoric, and her affect was depressed. She had fair insight. She was assigned a GAF score of 45.

Maria Domanska, M.D., with Pathways saw Haegele on May 13, 2008. She stated that Haegele was paranoid and had problems with mood swings, irritability, anger outbursts, and some depression. Haegele reported feeling uncomfortable and afraid of people, and she also complained of visual hallucinations. Dr. Domanska noted that Haegele had a diagnosis of bipolar affected disorder with psychotic features and gave her a Global Assessment Function (GAF) score of 50. Dr. Domanska saw Haegele seven times from June 25, 2008 to June 16, 2009 for complaints of feelings of depression, hallucinations, irritability, and anger issues.

Dr. Domanska completed the Mental Residual Functional Capacity Assessment for Haegele on December 9, 2008. She opined that Haegele had an

extreme limitation in reliability, a marked limitation in the ability to relate in social situations and behave in an emotionally stable manner, and a moderate limitation in her ability to function independently. Her opinion was based on her findings of mood stability, impaired insight and judgment, and problems with reality testing due to hallucinations. Dr. Domanska found that Haegele had an extreme inability to relate in social situations and a marked inability to visit friends and interact with the general public. She also noted extreme limitations in Haegele's ability to understand and carry out complex instructions, maintain attention and concentration for extended periods, and maintain regular attendance and be punctual. In the areas of remembering, understanding detailed instructions, sustaining an ordinary routine without supervision, and working in coordination with others, Dr. Domanska concluded that Haegele had marked limitations. She also opined that Haegele had poor to no ability to relate to co-workers, deal with work stresses, maintain attention, and respond to changes in a work setting.

Dr. Mary Mason with St. John's Clinic in Steelville, Missouri has been Haegele's primary care physician since 1995. On April 10, 2008, she wrote a letter stating, "In the time I have known Andrea, she has struggled to remain awake whenever not on Dexadrine" and that she had continuing problems with mood instability. She also reported that Haegele demonstrated mood and

behavioral issues as early as seven years old.  Dr. Mason said that Dr. Ahmed at

Pathways become Haegele's psychiatrist in 2001 and "obtained a sleep study at

Children's Hospital in St. Louis which showed narcolepsy."  There are numerous

treatment records from Dr. Mason for routine treatment dating back to August 24,

2004.  Dr. Mason also treated Haegele for ADHD and, beginning in 2006, noted

narcolepsy in her assessment.

On October 20, 2007, Haegele went to Dr. Mason complaining of back pain.

Dr. Mason assessed lumbar strain and prescribed Ibuprofen.  She reported back

pain again to Dr. Mason on January 29, 2008.  Dr. Mason referred Haegele for x-

rays of the lumbar spine.  The x-rays showed that the vertebral bodies and

intervertebral disc spaces were normal, with intact posterior elements, and normal

sacrum and sacroiliac joints.  She was advised of back strengthening exercises.

<u>Testimony</u>

Haegele was nineteen at the time of June 9, 2009 hearing and testified as

follows.  Haegele lives in a trailer with her mother and boyfriend.  She dropped

out of school after the eighth grade at the age of fourteen.  She had been in special

education classes for several years, but then she was placed back into regular

classes because her grades were "too good."  She did not feel like going to school

because people "eyeballed her" and stared at her.  Haegele did not have any

incidents at school, but she "just can't stand people I don't know."  She was taking GED classes, but she failed the test the first time she took it and then quit "because they took my medicine away and I couldn't focus right."  She has no vocational training and has never had a job.  She had two suicide attempts as a child and was hospitalized.

Haegele told the ALJ that she last smoked marijuana about two months before the hearing.  She smokes marijuana to calm down.  She pulled a knife on her sister's boyfriend about two months before the hearing because he "disrespected" her.  She was not on her medication when it happened because she did not have Medicaid at the time.  She testified that her Medicaid had been restored to her, but that she was not eligible for her medication that helped her stay awake unless she was enrolled in GED classes.  She was going to re-enroll in the classes, but she has a hard time understanding the lesson plans.

For the nine months prior to the hearing, she had been treated by Dr. Domanska, who prescribed her Abilify for mood stabilization.  She stated that she sometimes had a sharp pain in the middle of her back, but that it was "undiagnosed."  Haegele testified that she had been diagnosed with narcolepsy, which causes her to fall asleep constantly.  She sleeps twelve or thirteen hours each night, and then takes a three hour nap each day.  She was prescribed

Dexadrine to help her stay awake and focus, but she could not fill her prescription when her Medicaid benefits were terminated. Haegele does not have a checkbook or bank account and is only given a small amount of money at a time or else she would spend it on things she does not need.

Her mother Wynona Bryant also testified. Bryant receives disability benefits for bipolar disorder and back pain and takes her medications regularly. Bryant said her daughter cannot socialize with anyone and stays in her room constantly. Bryant confirmed that Haegele attacked her sister's boyfriend with a knife when she was not on her medication. She said that Haegele is better when she is on her medication, but she still has problems and does not like to leave her room or socialize. Bryant said that Haegele was antisocial in school and did not get along with other children, but she could not remember the other problems Haegele had in school. Haegele has four or five crying spells per week and loses her temper, even when she is taking her medication. Haegele often has confrontations with people and complains that they bother her. She fights with her sister and had one other "knife incident" in the three months before the hearing. Bryant helps her daughter with grocery shopping and paying bills because Haegele spends her money on unnecessary items. Small problems cause Haegele to "blow up." Bryant testified that Haegele can drive, but Haegele told Dr. Mason that she

was seeing and feeling spirits telling her to drive into a tree. Bryant did not know about the incident at the time it occurred, but she did allow Haegele to continue driving once or twice a month for about ten miles. Haegele has some difficulty with personal hygiene.

In response to questioning by the ALJ, Bryant said that she knew her daughter had smoked marijuana to calm herself down and go to sleep, but that she does not allow her to do it and does not know where and when her daughter uses drugs. Bryant denied using drugs herself. Bryant testified that she thought her daughter had only seen Dr. Domanska three or four times before her Medicaid was cut off, and "then she had to quit school because her Medicaid was dropped because she couldn't get out of bed to go."

After the hearing was concluded, the ALJ went back on the record for an addendum. The ALJ said that she reviewed Haegele's family history of drug use and found Bryant's testimony about Haegele's impairments to be "so inconsistent." The ALJ questioned the veracity of the testimony about Haegele attacking people with knives and wondered why, if true, the police were not involved and Haegele was not hospitalized. She also questioned whether Haegele's treating physicians knew about her drug use and her "noncompliance with her psychiatric mediation." The ALJ concluded her statement by stating, "So

I have a tremendous amount of doubt regarding Claimant's credibility and the mother's credibility. With that, let's go off the record because now I'm beating a dead horse." Haegele, her attorney, and her mother were not present for this addendum.

## Evidence Submitted to the Appeals Council[2]

The following additional evidence was presented to the Appeals Council. Haegele continued to seek treatment from Dr. Domanska for her bipolar disorder with supportive therapy and medication. The records show that Dr. Domanska saw Haegele seven times from June 25, 2008 through June 16, 2009. On June 25, 2008, Dr. Domanska reported that Haegele's mood was "more stable," with occasional irritability and anger outbursts. Haegele stated that she had "occasional visual hallucinations," but Dr. Domanska noted that she was not delusional, and was alert and well-oriented, with fair insight and judgment. She prescribed Abilify for Haegele's bipolar disorder. On August 19, 2008, Dr. Domanska reported that Haegele was still symptomatic because she could not get her medication for one week. Haegele denied feeling depressed or having mood

---

[2]Although this evidence was not submitted to the ALJ, "where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).

swings, but she reported instability and "I don't care feelings." Her sleep and appetite were good. Haegele "experienced demons talking to her," but was not delusional. She was alert, well-oriented, with fair insight and judgment. Dr. Domanska continued her medication. On September 18, 2008, Haegele requested to be taken off medication, but on her next visit she was placed on a different medication after reporting unstable moods, problems with irritability, and anger outbursts. On December 19, 2008, Dr. Domanska again prescribed Abilify for Haegele after she reported that she was "not doing well," had stopped her other medication, quit school, and was drinking.

On May 12, 2009, Dr. Domanska noted that Haegele had bipolar disorder and alcohol abuse. Haegele reported that she did not start taking Abilify again as prescribed because "there is no use if I will lose my insurance again." She reported that she was not doing well and was depressed, with mood swings, irritability, anger outbursts, and feelings of hopelessness. She was not delusional and appeared alert and well-oriented, with fair insight and judgment. Dr. Domanska advised her to start her medication and talked to her about coping skills and staying sober. On June 16, 2009, Haegele reported that she was once again taking Abilify and had started to feel better. She denied feeling depressed but her mood was unstable, with irritability and anger outbursts. She admitted to

occasionally drinking alcohol.  She was advised to stay sober and continue her medication.

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, <u>id.</u>, or because the court would have decided the case differently.  <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000) (quoting <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999)).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  <u>Pearsall v. Massanari</u>, 274 F.3d

1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

> (1) the credibility findings made by the Administrative Law Judge;
>
> (2) the education, background, work history, and age of the claimant;
>
> (3) the medical evidence from treating and consulting physicians;
>
> (4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
>
> (5) any corroboration by third parties of the plaintiff's impairments; and
>
> (6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in social security regulations as the inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R.

404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled,

the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

The Commissioner has supplemented the five-step sequential process with regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a. First, the Commissioner must evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable impairment; and specify such symptoms, signs, and laboratory findings substantiating the presence of such impairment.  20 C.F.R. § 404.1520a(b)(1).  The Commissioner then must determine the severity of the impairment.  To do so, the Commissioner is required to rate the degree of functional loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme.  When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more . . . .
>
> . . .
>
> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. § 404.1520a(c)(4)-(d)(1).

If the mental impairment is determined to be "severe," the Commissioner must then determine if it meets or equals a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). This is done "by comparing the medical findings about [the] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." Id. If the severe impairment does not meet or equal a listed mental disorder, the Commissioner then performs an RFC assessment. 20 C.F.R. § 404.1520a(d)(3). At the initial and reconsideration steps of the administrative process, the Commissioner must complete a standard document outlining the steps of this procedure. At the hearing and Appeals Council levels, application of the procedure must documented in the written decision. 20 C.F.R. § 404.1520a(e).

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2). The Commissioner's failure to follow the appropriate procedure in determining the severity of a claimant's mental impairment requires a remand. Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992).

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

Id. at 1322.  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding.  Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

# The ALJ's Findings

The ALJ issued a decision that Haegele was not disabled on June 18, 2009. The ALJ concluded that Haegele suffered from the severe impairments of bipolar affective disorder and attention deficit hyperactivity disorder, but that she did not have an impairment or combination of impairments that met or medically exceeded one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In reaching this conclusion, the ALJ determined that Haegele's bipolar disorder did not meet any appropriate medical listings because she has only moderate limitations in concentration, persistence, and pace, with only mild limitations in social functioning and activities of daily living. The ALJ concluded that Haegele's limitations were appropriately reflected in restrictions against understanding and following very complex instructions, and that she could understand and follow moderately complex instructions. The ALJ also decided that Haegele did not suffer from narcolepsy for the following reasons:

> The claimant alleges disability due to narcolepsy. The claimant was previously reported to have narcolepsy in 2006, by Dr. Mason. In a letter dated April 10, 2008, Dr. Mason reported that the claimant obtained a sleep study at Children's Hospital in Saint Louis which showed narcolepsy.
>
> However, first noted is the fact that the medical treatment records do not include documentation of diagnostic testing and results revealing narcolepsy. Although prior school records document the claimant

would sleep through class, the record does not document that such was the result of narcolepsy as opposed to boredom, a lack of effort or a lack of sleep. Third grade school records, from 1999, do document the claimant exhibiting a lack of effort.

Further, Dr. Mason's medical records from August 2004 through January 2008 do not document ongoing treatment sought for uncontrolled narcolepsy. Dr. Mason's medical treatment records do not include documentation of the previously referenced sleep study. The remainder of the medical treatment records do not document ongoing treatment aggressively sought and frequently received for complaints of uncontrollable narcolepsy for several years. The medical treatment records do not document objective medical findings, by medical staff, that the claimant has been unable to remain awake at any particular time, for narcoleptic reasons, since at least December 2007. The claimant's reported activities of daily living also do not document significant support for a finding of severe narcolepsy.

A report of contact between Dr. R. Stoecker, M.D., of the state agency, and a nurse of Dr. Mason, was conducted for the purpose of obtaining any data (such as a neurological referral and a sleep study), which would support the diagnosis of narcolepsy. In response to Dr. Stoecker, Dr. Mason's nurse was reported to state that Dr. Mason's records did not actually include a record of the sleep study. Inconsistent with the subsequent letter by Dr. Mason, the nurse apparently reported that the sleep study may have been through "pathways" (as opposed to Children's Hospital). It was reported by the nurse that the finding of narcolepsy was documented by statements by a teacher that the claimant was falling asleep in school. However, as noted above, the record does not document that the claimant was falling asleep due to narcolepsy as opposed to boredom, a lack of sleep or even a lack of effort. Further, the record does not contain treatment notes from Pathways, documenting a sleep study confirming narcolepsy in 2006.

Dr. Stoecker reported that the statements by the teacher do not

constitute documentation of a medically determinable impairment. Dr. Stoecker reported that the narcolepsy was an unconfirmed diagnosis. Finally, the undersigned notes that a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms. Thus, in light of the above, the undersigned finds that the claimant is without a medically determinable impairment.

The ALJ also determined that the medical treatment records failed to support a finding that Haegele suffered from a severe mental impairment imposing significant limitations of function. In so doing, the ALJ discounted the findings of the consultative psychologist, Thomas Spencer, and Haegele's treating psychiatrist, Dr. Domanska. The ALJ believed that Spencer's findings of significant limitations in Haegele's ability to socially interact and adapt to her environment were not supported by objective medical findings with respect to complexity of tasks, social interaction, and adaptation. Moreover, the ALJ concluded that Spencer's findings were actually inconsistent with allegations of a disabling mental impairment because Haegele was alert and oriented during the examination, described her mood as "mellow," denied hearing voices, and did not appear to respond to internal stimuli. Haegele was not suspicious, hypervigilant, or overly paranoid, and her thoughts were "relatively intact." The ALJ also concluded that Haegele exhibited no significant deficits in social interaction because she was cooperative, maintained adequate eye contact during the

examination, and was adequately groomed. Although Haegele had difficulties with five minute recall and serial threes, the ALJ decided that Haegele had little impairment in long term memory and was not unable to concentrate. The ALJ also cited Haegele's statements to Spencer -- that she could not recall taking any other psychotropic medication other than Lexapro "at one time," and that she has not seen a psychiatrist in a couple of years because she felt "she never really needed to" -- as evidence that Haegele did not suffer a severe mental impairment.

As for the assessments by Pathways and Dr. Domanska, the ALJ found that Haegele was possibly motivated to seek treatment because her benefits were being terminated. In addition, Haegele reported only taking medication for narcolepsy at that time, which the ALJ determined to be inconsistent with the findings by the social worker at Pathways and Dr. Domanska. The ALJ also discounted Dr. Domanska's opinion for the following reasons:

> Moreover, although there is an assessment from Dr. Domanska, and despite the claimant's testimony of long term treatment with Dr. Domanska, the medical treatment records do not document ongoing treatment received through Dr. Domanska, in the form of medical treatment notes. Dr. Domanska's findings are unsupported by any of her own notes. Moreover, even if medical treatment records were within the record, testimony by the claimant's mother was that Dr. Domanska had visited with the claimant only "two or three times." These facts undermine any weight accorded to the opinion of Dr. Domanska.

The ALJ also pointed out that the medical treatment records did not reflect mental health treatment aggressively sought and frequently received. The ALJ noted that: Dr. Mason did not document "frequent or long term psychiatric hospitalizations for several years;" Haegele did not seek "ongoing and frequent treatment through a psychiatrist, psychologist or counselor for several years;" and, Haegele had not engaged in any suicidal type activity for the past few years. The ALJ also claimed that the medical treatment notes "do not document any medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits with respect to the claimant's mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, activities of daily living, speech, psychomotor activity, focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, abilities to understand and follow instructions, judgment insight, cognitive function or behavior for several years." The ALJ concluded that these facts "severely undermined" the weight afforded to the findings by the Pathways social worker, the consultative psychologist, and Dr. Domanska. The ALJ also discounted their findings because they "appear to be almost entirely based upon allegations by the claimant and her mother, rather than actual objective medical findings."

The ALJ also discounted Haegele's credibility because she told Spencer that she only experimented with drugs or alcohol in the past, yet she reported that she was "still using" marijuana and alcohol in March of 2008. Haegele also testified to smoking marijuana about two months before the hearing to calm her down. The ALJ concluded that these facts were "very inconsistent with any allegations of a severe impairment outside the realm of drug and alcohol abuse." The ALJ also pointed to the "extreme inconsistencies" in Haegele's testimony about Medicaid as further evidence detracting from her credibility. The ALJ stated that Haegele testified that she quit school not because she had problems but just because she "did not feel like going." The ALJ found this testimony did not "enhance her credibility with respect to motivation."

The ALJ also concluded that Bryant's testimony was not credible for the following reasons:

> The claimant's mother testified that the claimant seldom leaves the house. Testimony, by the mother, regarding the claimant's limitations and symptoms, such as being so mentally impaired that she does not leave the house, was accompanied by testimony that her daughter leaves the house to smoke marijuana, and then by testimony that she is unaware of when her daughter uses marijuana and finally by testimony that her daughter comes home to sleep after using marijuana. The testimony by the mother is extremely inconsistent. Testimony, by the claimant's mother, regarding the severity of the claimant's symptoms, (including social avoidance), is not credible.

The claimant's mother alleged that the claimant told her doctor that while driving, "spirits" told her to drive into a tree. However, the mother's testimony indicates the claimant is still allowed to drive. This fact appears somewhat incredible and further undermines the mother's credibility.

The record documents that the claimant's mother has a history of drug abuse. Testimony establishes that the claimant's mother receives disability benefits. This fact does not bode well for the claimant's credibility with respect to benefit motivation.

The ALJ also questioned the credibility of Haegele and Bryant with respect to their testimony that Haegele attacked people with knives:

Testimony was that the claimant has attacked people with knives on a couple of occasions, in the past few months. However, the undersigned has a tremendous amount of doubt regarding these allegations. First, it was reported the claimant was not upon medications, indicating symptoms controllable through treatment. Moreover, if the claimant had attacked another person with a knife, it is not clear why police were not involved. Further, considering the fact that the claimant was not upon medications, and considering her history and her mother's psychiatric history, it seems reasonable that the claimant would have been taken to a hospital, for medications or at least to address any psychiatric issues. The lack of evidence of such severely detracts from the credibility of the allegations by the claimant and her mother.

The ALJ found, "after giving [Haegele] great benefit of the doubt," that Haegele had moderate limitations in concentration, persistence, and pace, which "are reflected in restrictions against understanding and following very complex instructions." The ALJ concluded that Haegele retained the ability to maintain

concentration, persistence, pace, and attention for two hour segments over an eight hour period, demonstrate adequate judgment, and make adequate decisions, "at least outside the realm of drug abuse and her choice to use drugs." The ALJ found no significant limitations of function in the area of social avoidance and adaptation "outside the realm of non-compliance or drug abuse." The ALJ discounted the low GAF scores in the record because she found them to be "largely based upon the claimant's subjective complaints and [] unsupported by the medical treatment records and objective medical findings." She also cited to the official comments published in August of 2000, in which the Commissioner noted that the GAF "does not have a direct correlation to the severity requirements in our mental disorders listings." Because the ALJ concluded that Haegele did not have a medically determinable impairment of narcolepsy, she concluded that Haegele was "without limitations upon exertion."

Using Appendix 2 of the Medical Vocational Rules, the ALJ determined that, considering Haegele's age, education, work experience, and residual functional capacity, there were jobs in significant numbers in the national economy that Haegele could perform. Accordingly, the ALJ found Haegele to be not disabled.

## Discussion

### Physical Impairments

Haegele first contends that the ALJ erred in discrediting her complaints of narcolepsy and back pain. At step two of the sequential evaluation process, an ALJ determines the medical severity of a claimant's impairments. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Although Haegele has "the burden of showing a severe impairment that significantly limited her physical or mental ability to perform basic work activities, . . . the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks and citations omitted).

Here, substantial evidence supports the ALJ's conclusion that Haegele's back pain was not a severe impairment. Haegele admitted that her back pain was an undiagnosed condition, and the x-rays of her back showed that the vertebral bodies and intervertebral disc spaces were normal, with intact posterior elements,

and normal sacrum and sacroiliac joints. There is no evidence in the record to suggest that Haegele's back pain caused no more than minimal limitation of her ability to perform basic work activities.

The ALJ also concluded that Haegele did not suffer from a medically determinable impairment of narcolepsy because she did not have documentation, such as a sleep study, to confirm the diagnosis. In reaching her conclusion, the ALJ relied on the report of Dr. Stoecker, M.D., a consulting physician who did not examine Haegele. Dr. Stoecker concluded that Haegele had an unconfirmed diagnosis of narcolepsy because her treating physician, Dr. Mason, did not have a copy of a sleep study in her file and Dr. Mason's nurse told Dr. Stoecker's office that she diagnosed Haegele based on reports that she was falling asleep in school.[3] This brief opinion from a consultative examiner who did not treat Haegele contradicts the evidence provided both by her treating doctor and the consulting doctors who actually examined Haegele. Dr. Mason, Haegele's primary care physician since 1995, began treating Haegele for narcolepsy in 2006 and opined that Haegele had "struggled to remain awake whenever not on Dexadrine" and that she had "obtained a sleep study at Children's Hospital in St. Louis which showed

---

[3]Dr. Stoecker's opinion consists of one typewritten paragraph, which I have included in full above. The record also contains one half-page of notes from Stoecker. (Tr. at 141). His opinion is the most abbreviated medical opinion appearing in Haegele's file.

narcolepsy."  Dr. Frisch, who examined Haegele in connection with her benefits application, noted that "she appeared lethargic, possibly due to narcolepsy."  Dr. Busby, another consultative examiner, also opined that "[t]he evidence shows that the individual does carry a diagnosis of narcolepsy and that she has associated treatment."  Dr. Busby concluded that Haegele's narcolepsy, while it did not "severely limit her daily functioning of her school functioning," limited her ability to lift heavy weights (50 pounds).  Thomas Spencer, the consultative psychologist, also observed that Haegele was lethargic and subdued during her examination.

The ALJ claimed that Haegele's school records did not document that Haegele was falling asleep "due to narcolepsy as opposed to boredom, a lack of sleep, or even a lack of effort."  Yet this is not true.  Haegele's school records from 2001 also refer to a sleep study that was conducted by Dr. Uong.  Although the school district determined that Haegele was "not disabled,"[4] it made this determination before receiving Haegele's test results for narcolepsy.  The evaluators acknowledged that the testing had to be redone because Haegele kept falling asleep during the first round of testing, before she was treated for narcolepsy.  It was also noted that Haegele's behavior at school "drastically

---

[4]The evaluators who made this determination for the school district are not medical doctors.

changed" after she began receiving medication for narcolepsy, and it was based, in part, upon this improved behavior that the school district determined she was not disabled.

The ALJ also claimed that Haegele's reported activities of daily living "do not document significant support for a finding a severe narcolepsy." This finding is not supported by substantial evidence on the record as a whole. Haegele testified that she falls asleep constantly, and sleeps twelve or thirteen hours each day, plus a three hour nap, even while on her medication. She also said that she was not able go to or concentrate in her GED classes without Dexadrine, and that she failed the test because she was not on her medication. In her application for benefits, Haegele also stated that she struggled to get out of bed each day, and her mother confirmed this. Both Haegele and her mother testified that Haegele stays in her room constantly and has problems socializing with anyone, even while on medication. The ALJ did not cite any specific examples of daily activities that were allegedly inconsistent with a finding of a severe impairment of narcolepsy, and her conclusion is not supported by substantial evidence.

The ALJ has a duty of fully and fairly developing the facts of the case, even when the claimant is represented by counsel. Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990). This is not a case, as claimed by the ALJ, where Haegele's

narcolepsy was supported only by her statement of symptoms. Here, Haegele's treating physician and two of the examining consulting physicians all diagnosed her with narcolepsy, she has been treated for narcolepsy with Dexadrine since 2006, and the medical and school records refer to a sleep study that was not part of the file. If the ALJ believed that the results of a diagnostic test, such as a sleep study, were necessary to determine whether Haegele suffered from narcolepsy but were not part of the file, then she should have sought specific documentation from Haegele or ordered additional testing instead of merely substituting her own opinion about Haegele's impairments for that of the physicians. See Miller v. Sullivan, 953 F.2d 417, 422 (8th Cir. 1992). In doing so, the ALJ erred and the matter must be remanded. See Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991).

## Mental Impairment

The ALJ did identify the broad areas of functioning required for making a determination about the severity of Haegele's mental impairment. However, a review of the decision shows that the ALJ failed to consider the record as a whole in determining the level of severity of Haegele's mental impairment. Because the ALJ failed to evaluate the evidence properly, she necessarily failed to adequately conduct the required sequential analysis for determining mental impairments, and

the matter must be remanded.

Recognizing that the assessment of functional limitations imposed by a claimant's mental impairment is a "complex and highly individualized process," 20 C.F.R. § 404.1520a(c)(1), the Regulations require the Commissioner to

> consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effect of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

Id.

Likewise, longitudinal evidence of a claimant's mental impairment must necessarily be considered when evaluating whether the impairment meets or equals a listed impairment. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(D)(2). In this case, however, in determining the level of severity of Haegele's mental impairment, the ALJ ignored the medical evidence from both treating and consultative examiners of her limitations in social functioning.[5] Instead, the ALJ picked out isolated instances from Haegele's school records that indicated she was "doing well" without consideration of the longitudinal evidence of Haegele's failing grades, that she dropped out of school at age fourteen, that she quit her

---

[5]This issue will be discussed in more detail below.

GED classes after failing the exam, and that she had difficulties getting along with others.  The ALJ also relied on Haegele's absence of hospitalization and mental health treatment for several years as evidence that she lacked severe mental health symptoms.  Again, in consideration of this evidence the ALJ ignored longitudinal evidence of how Haegele's symptoms were affected by her surroundings. Haegele's failure to seek treatment came after she dropped out of the structured setting of school.  Even at home, Haegele and her mother both testified that Haegele had difficulties interacting with people, including her family, and that she mostly stayed in her room by herself.  The ALJ's assessment that Haegele's treatment records do not document any medical observations by any treating psychiatrist or psychologist of significant abnormalities or deficits with respect to her mood, affect, social interaction, activities of daily living, and judgment, among others, is not supported by, and indeed is contrary to substantial evidence on the record as whole.[6]  Such discrepancies between the ALJ's decision and the medical evidence undermine the ALJ's ultimate conclusion that Haegele's mental

_____

[6]Dr. Domanska's Mental Residual Functional Capacity Assessment notes extreme or marked limitations in nearly all of these areas.  Haegele's initial intake assessment at Pathways notes that Haegele had severe mania and impulse control, hallucinations, phobia, psychomotor retardation, and depressed mood.  Dr. Domanska likewise assessed Haegele with paranoia, mood swings, anger outbursts, visual hallucinations, depression, and irritability.  Spencer and Dr. Frisch also diagnosed Haegele with significant limitations in social functioning, and Spencer concluded that Haegele was only marginally capable of managing her benefits without assistance.

condition is not disabling.  See Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996).  In addition, because the ALJ did not fairly consider evidence of Haegele's mental impairment, it cannot be said that the ALJ fairly considered the combined effect of all of her impairments.  See Delrosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1991).  As such, remand is appropriate so that the ALJ may review and discuss the entire record as it relates to Haegele's physical and mental impairments, both singly and in combination.

## Treating Physicians

Haegele next contends that the ALJ erred in evaluating the opinions of her treating physicians.  "It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks and citation omitted).  When considering professionals' opinions, the ALJ must defer to a treating physician's opinions about the nature and severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions."  Ellis v. Barnhard, 392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. pt. 404(a)(2)).  A treating physician's opinion regarding a claimant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998). While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that it "does not automatically control, since the record must be evaluated as a whole." <u>Bentley v. Shalala</u>, 52 F.3d 784, 785-86 (8th Cir. 1995). After reviewing the record as a whole, an ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions. <u>See</u> <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's are of speciality. The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination of decision for the weight [given to the] treating source's opinion."

20 C.F.R. § 404.1527(d)(2).

Here, Dr. Domanska, Haegele's treating psychiatrist, opined that Haegele had an extreme limitation in reliability, a marked limitation in the ability to relate in social situations and behave in an emotionally stable manner, and a moderate limitation in her ability to function independently. Her opinion was based on her findings of mood stability, impaired insight and judgment, and problems with reality testing due to hallucinations. Dr. Domanska found that Haegele had an extreme inability to relate in social situations and a marked inability to visit friends and interact with the general public. She also noted extreme limitations in Haegele's ability to understand and carry out complex instructions, maintain attention and concentration for extended periods, and maintain regular attendance and be punctual. In the areas of remembering, understanding detailed instructions, sustaining an ordinary routine without supervision, and working in coordination with others, Dr. Domanska concluded that Haegele had marked limitations. She also opined that Haegele had poor to no ability to relate to co-workers, deal with work stresses, maintain attention, and respond to changes in a work setting. She assigned Haegele a GAF score of 50 during her first visit. Dr. Stuve, a consultative examiner who reviewed Haegele's records, also found that Haegele would have moderate difficulties relating to the general public and coworkers and

adapting to changes in the workplace, although he concluded that she could

understand and remember simple directions, and maintain concentration and

persistence for simple tasks.  Thomas Spencer, a licensed psychologist who

examined Haegele at the SSA's request, likewise concluded that she would have

significant limitations in her ability to interact socially and adapt to the

environment, and assigned her a GAF score of 45-50.  Dr. Frisch reviewed

Spencer's findings and agreed that Haegele had significant social limitations.

Haegele was also assigned GAF score of 45during her initial assessment at

Pathways.

The ALJ concluded that Haegele had only moderate limitations in

concentration, persistence and pace, which were reflected in restrictions against

understanding and following very complex instructions.  In reaching her decision,

the ALJ refused to accord any weight to Dr. Domanska's opinion.  In doing so, the

ALJ relied on the fact that Haegele's primary care physician, Dr. Mason, did not

treat or note any severe mental health symptoms.  Dr. Mason is a family physician,

not a psychiatrist, and there is no evidence to suggest that she would or could

provide the type of mental health treatment that Dr. Domanska provided to

Haegele.[7]  Dr. Mason, did, however, note Haegele's bipolar disorder and

_____

[7]Dr. Mason did prescribe Dexadrine for Haegele's ADHD and narcolepsy.

depression, and she observed Haegele with a dull affect. The fact that Dr. Mason did not treat Haegele for bipolar disorder does not, contrary to the ALJ's decision, undermine the weight to be afforded to Dr. Domanska's assessment.  Dr. Domanska is Haegele's treating mental health physician, and her opinions are entitled to controlling weight if well-supported and not inconsistent with other substantial evidence in the record.  Dr. Mason's treatment notes are not inconsistent with Dr. Domanska's opinions, and it was error for the ALJ to disregard Dr. Domanska's findings on this basis.

The ALJ also discredited Dr. Domanska's findings for lack of ongoing treatment and supporting records.  Haegele's mother testified that Haegele had only seen Dr. Domanska "two or three times."  This conclusion is not supported by substantial evidence.  Dr. Domanska's treatment notes are part of the record, and they demonstrate that she treated Haegele regularly in eight sessions from May 13, 2008 through June 16, 2009.  Haegele was also evaluated at Pathways for her initial assessment before being seen by Dr. Domanska.[8]  While the frequency of treatment is a factor in determining the weight to be given a physician's opinion,

---

[8]The ALJ claims that Dr. Domanska's treatment notes were not within the record.  Even if true, they were provided to the Appeals Council and must therefore be considered in determining whether the decision is supported by substantial evidence as a whole. See Davidson, 501 F.3d at 990.

see also Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004), here it was error

to conclude that Dr. Domanska's opinions were entitled to no weight because she

had only seen Haegele a couple of times.  The ALJ also improperly discounted the

medical diagnoses as having been based on Haegele's recitation of events because

"a patient's report of complaints, or history, is an essential diagnostic tool."

Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).  Here, Haegele's claimed

symptoms are consistent with objective tests, the nature of her disorder, and

eyewitness testimony from her mother.

The ALJ also discounted the findings of Spencer as inconsistent with his

objective medical findings to the extent that they supported Dr. Domanska's

opinion.  Yet Spencer noted that Haegele identified none of three proverbs, two of

three similarities, and demonstrated a questionable working knowledge of social

norms.  Haegele could not recall three objects after five minutes without

distraction and had trouble with her serial threes.  Dr. Frisch found Spencer's

findings to be consistent with the evidence in the file after examining Haegele and

agreed with Spencer's opinion that Haegele had significant social limitations.

Haegele's treating psychiatrist, the consultative psychologist, and the consultative

physician who reviewed the psychologist's assessment all agreed that Haegele

suffered from significant limitations in social functioning, and there is no medical

opinion in the record that contradicts their assessments.  Despite the medical

evidence, the ALJ concluded Haegele had only moderate limitations in

concentration, persistence, and pace.  In reaching this conclusion, the ALJ ignored

the medical evidence and substituted her own opinion for that of her physicians.

Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990).   In doing so, she erred.

Although the ALJ is not limited to considering only medical evidence in

determining a claimant's residual functional capacity, the ALJ is "required to

consider at least some supporting evidence from a professional," because a

claimant's residual functional capacity is a medical question.  Lauer v. Apfel, 245

F.3d 700,704 (8th Cir. 2001).[9]  Because the ALJ improperly disregarded the

treating physician's opinion and the other medical evidence of Haegele's mental

impairments, substantial evidence as a whole does not support the ALJ's decision

and the matter must be remanded.

The same analysis also applies to Dr. Mason's opinions regarding Haegele's

narcolepsy for the reasons discussed above.  On remand the ALJ should consider

all of the relevant evidence in making her determination of Haegele's physical and

---

[9]Residual functional capacity is what the claimant can still do despite her physical or
mental limitations.  20 C.F.R. pt. 404.1545(a); Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).
The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity
based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).

mental impairments and functional limitations resulting from these impairments, including an evaluation of Dr. Mason's opinions under the appropriate standards in light of any additional testing or consultative examinations that may be required.

## Credibility Determination

I also find that the ALJ improperly evaluated testimony under the standards set forth in <u>Polaski</u>, 739 F.2d 1320.  Although the ALJ may discount a claimant's subjective complaints, she may not do so on the sole ground that those complaints are not fully supported by the objective medical evidence.  <u>Jeffrey v. Secretary of Health & Human Servs.</u>, 849 F.2d 1129, 1132 (8th Cir. 1988).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998); <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997).  Thus, in assessing subjective allegations, the ALJ may consider the frequency and type of the claimant's medication or treatment, the claimant's daily activities, and the claimant's appearance and demeanor at the hearing.  <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996); <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1186 (8th Cir. 1989).  When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination using the factors set forth in <u>Polaski</u>.  <u>Baker v. Apfel</u>,

159 F.3d 1140, 1144 (8th Cir. 1998); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered the relevant evidence.  <u>Jeffrey</u>, 849 F.2d at 1132; <u>Butler v. Secretary of Health & Human Servs.</u>, 850 F.2d 425, 429 (8th Cir. 1988).

Here, the ALJ rejected Haegele and Bryant's testimony as not credible based on questions she had about their testimony.  Both witnesses testified at the hearing and were available for questioning (and indeed were questioned) by the ALJ.  Yet the ALJ waited until the hearing was concluded and the witnesses and the claimant's attorney were no longer present before she went back on the record for an addendum.  In the addendum, she accused Bryant of having current drug and alcohol abuse problems and questioned the veracity of her testimony about Haegele attacking her sister's boyfriend with a knife based on perceived inconsistencies in her story.  The ALJ then relied upon these perceived inconsistencies in reaching her decision that Haegele and her mother were not credible.  Credibility determinations, when adequately explained and supported, are for the ALJ to make.  <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000).  Here, however, the ALJ relied upon nagging questions left unanswered as a basis for her credibility determination when these questions could have been posed to Bryant

and Haegele during the course of the hearing.  Whether their responses would

have been a basis for bolstering or undermining their credibility is unknown, but at

least the record would have been complete and the ALJ's credibility determination

would have been supported by evidence in the record.   Here, the ALJ's credibility

determination is not supported by substantial evidence as a whole.  In light of

remand, the ALJ should develop these and any other facts as needed to make a

credibility determination based on a full and fair record.

Vocational Expert

Finally, Haegele contends that the ALJ erred in not obtaining vocational

testimony and relying instead on the Medical Vocational Guidelines when

determining that there is work in the economy which she can perform.  Resort to

the Guidelines is only appropriate when there are no non-exertional impairments

that substantially limit the ability of a claimant to perform substantial gainful

activity.  If the claimant is found to have only exertional impairments, the

Commissioner may meet this burden by referring to the Guidelines.  Robinson v.

Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  But if the claimant is also found to

have non-exertional impairments that diminish the claimant's capacity to perform

the full range of jobs listed in the Guidelines, the Commissioner must solicit

testimony from a vocational expert (VE) to establish that there are jobs in the

national economy that the claimant can perform.  Id.  However, "an ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines."  Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997) (internal quotation marks and citation omitted).  Because I am remanding this matter to the Commissioner for further proceedings, I leave it to the ALJ to decide whether testimony from a vocational expert is required for rehearing.

## Conclusion

I find that the ALJ did not fulfill her duty of fully and fairly developing the record and properly evaluating the evidence presented.  As a result, I cannot conclude that there is substantial evidence on the record as a whole to support the ALJ's decision.  Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner for a consideration of Haegele's claim in light of all medical records on file and development of any additional facts as needed.  The Commissioner should reevaluate Haegele's physical and mental impairments and complaints in accordance with Polaski and order additional consultative examinations, if necessary, to determine Haegele's impairments and limitations.

Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order.  See Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate Judgment in accord with this Memorandum and Order is entered this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of March, 2011.